IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| ZURICH AMERICAN INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:09cv1394 |
| PUBLIC STORAGE f/k/a SHURGARD STORAGE CENTERS INC., et al., | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

This diversity declaratory judgment action is a dispute over whether the plaintiff-insurer

has a duty to defend the defendant-insured in an ongoing state-court lawsuit. Specifically, at

issue on cross-motions for summary judgment is whether the defendant-insured's commercial

general liability insurance policy may provide coverage with respect to any of the claims in the

Virginia state-court action against the insured. For the reasons that follow, the policy provides

coverage for one claim, and because under governing Washington law the insurer has a duty to

defend only covered claims,[1] it follows that summary judgment must be granted in favor of the

defendant-insured on the covered claim and in favor of plaintiff-insurer on the remaining claims.

---

[1] *See Seaboard Surety Co. v. Ralph Williams' Northwest Chrysler Plymouth, Inc.*, 504 P.2d 1139, 1140 n.1 (Wash. 1973); *Waite v. Aetna Cas. & Surety Co.*, 467 P.2d 847, 855 (Wash. 1970).

Plaintiff, Zurich American Insurance Company ("Zurich"), is an insurance company incorporated in New York and licensed to do business in Virginia. Defendants are Public Storage and PS Business Parks, Inc.[3] Public Storage is a California-based provider of rental storage space that acquired Shurgard Storage Centers, Inc. ("Shurgard") in 2006 and assumed all of Shurgard's rights and liabilities. PS Business Parks, Inc. is a California-based affiliate of Public Storage that owns and operates commercial and industrial business parks. Hereinafter, Public Storage and PS Business Parks, Inc. are referred to collectively as "Public Storage."

**Underlying Lawsuit**

This dispute arises out of an ongoing state court action in Fairfax County Circuit Court. In that action, filed on May 22, 2009, Talal M. Nsouli ("Nsouli") alleges that Public Storage and a co-defendant, Sam's Contracting, Inc. ("Sam's Contracting"), are liable for the unlawful removal and destruction of personal property stored in his self-storage unit. *See Nsouli, et al. v. Public Storage, et al.*, Civil Action No. 2009-7568 (Va. Cir. Ct. May 22, 2009). In his complaint (hereinafter "Underlying Complaint"), Nsouli makes the following allegations: Nsouli is a physician specializing in the diagnosis and treatment of allergy, asthma, and immunology diseases. Underlying Comp. ¶ 7. He maintains offices in Virginia and the District of Columbia. *Id.* In August 1999, Nsouli leased a storage unit at Public Storage's facility in Burke, Virginia for the purpose of storing medical and financial records. *Id.* ¶ 8. He stored approximately 600 boxes of records in his storage unit. *Id.* ¶ 9.

---

[2] The undisputed facts recited herein are derived from the parties' pleadings and supporting documents.

[3] In its complaint filed on December 22, 2009, Zurich identified Talal M. Nsouli, M.D., as a defendant. However, on March 23, 2010, Zurich voluntarily dismissed Nsouli from the action without prejudice, pursuant to Rule 41(a)(1)(A)(i), Fed. R. Civ. P.

Nsouli decided to rent the storage unit because he relied on Public Storage's

representations that it had enhanced security measures in place to store business records safely.

*Id.* ¶ 8. Specifically, the Underlying Complaint alleges that:

> Public Storage represented in writing and orally that its business park facilities were equipped to safely and securely store [sic] business records and that the company had policies and procedures, including enhanced security measures, to prevent the loss or destruction of the customers' property.

*Id.* ¶ 6. The Underlying Complaint further alleges that Public Storage made a number of other

representations in advertising and elsewhere about the safety and security of storing business

records at its facility, including: "Store managers regularly walk the property to check that units

are locked"; "24 Hour Security"; and "You can count on us to act as an extension of your

business." *Id.*

In April 2006, the ceiling in Nsouli's storage unit needed repair. *Id.* ¶ 14. Public Storage

requested a key from Nsouli to allow Public Storage to enter his unit and make the repairs. *Id.*

Nsouli delivered the key to Public Storage on May 31, 2006. *Id.* Thereafter, Public Storage

hired Sam's Contracting, a third-party general contractor, to repair the ceiling. *Id.* ¶ 17. The

repairs began on June 2, 2006 and were completed a few days later on June 5, 2006. *Id.* ¶¶ 17,

18. At some point during the repair process, the Underlying Complaint alleges that

"[d]efendants removed and destroyed all of the medical and financial records in [Nsouli's

storage unit] without authorization." *Id.* ¶ 17. The Underlying Complaint further alleges that the

"unauthorized removal and destruction of [] Nsouli's property took two days." *Id.* ¶ 18. During

that time, "[n]umerous Public Storage representatives and agents witnessed and directly

authorized the removal and destruction of the property." *Id.* ¶ 18. Public Storage's

representatives and agents "failed to inquire, intercede or otherwise take reasonable steps to

safely secure [sic] the property." *Id.* At the time his records were destroyed, Nsouli was current in making rental payments for his storage unit. *Id.* ¶ 13.

Not until almost two weeks after the repairs were completed did Public Storage call Nsouli to inform him that his records were destroyed.[4] *Id.* ¶ 20. The manager told Nsouli that Public Storage was conducting an internal investigation, and that he would report his findings to Nsouli. *Id.* ¶ 21. Despite the manager's representations, Nsouli was never told of the results of Public Storage's internal investigation. *Id.*

Nsouli notified the Fairfax County Police of the destruction of his records, and the police conducted an investigation. *Id.* ¶ 22. According to the police report attached to the Underlying Complaint,[5] Nsouli scheduled the repair of his unit with a particular Public Storage manager. Underlying Comp. Ex. B. On the day that Sam's Contracting arrived to begin the repair work, a different Public Storage manager was on duty. *Id.* According to Sam's Contracting, the acting manager told them to clear out Nsouli's storage unit, so they removed the boxes and disposed of them at the dump. *Id.* The acting manager denied telling Sam's Contracting "to take the boxes." *Id.*

The Underlying Complaint alleges that Public Storage's conduct caused substantial damage to Nsouli's medical practice and research. Specifically, the Underlying Complaint alleges that patient records "are critical to the value of a medical practice," and that the unlawful destruction of Nsouli's records "diminishes his ability to receive proper value for his practice."

---

[4] The Underlying Complaint alleges that during the two-week period between the destruction of his records and the phone call from Public Storage notifying him of their destruction, Nsouli made repeated phone calls to Public Storage to inquire about the status of the repairs, but these phone calls were ignored. Underlying Comp. ¶ 19.

[5] Because the police report was attached to the Underlying Complaint as an exhibit, the report is "a part" of the pleading. Va. Sup. Ct. R. 1:4(i) ("The mention in a pleading of an accompanying exhibit shall, of itself and without more, make such exhibit a part of the pleading.").

*Id.* ¶ 26. In addition, the Underlying Complaint alleges that the destruction of the medical records damaged Nsouli's planned research by depriving him of the clinical data contained in the records. *Id.* ¶ 27.

Based on these allegations, the Underlying Complaint asserts multiple claims against Public Storage. They are as follows:

> (i) Count I (Breach of Bailment): Public Storage breached its duty as a bailee by failing "to exercise the required duty of care to prevent the damage or loss of the bailed property." *Id.* ¶ 30.
>
> (ii) Count III (Violation of the Virginia Consumer Protection Act): Public Storage violated multiple provisions of the Virginia Consumer Protection Act ("VCPA"), Va. Code § 59.1.200 by: (a) "misrepresent[ing] the provision and implementation of security measures to secure the premises and to prevent the loss of property"; (b) "misrepresent[ing] that Public Storage would conduct an internal investigation and report the findings regarding the wrongful disbursement of the property"; and (c) "willfully conceal[ing] the unlawful destruction of the property, thereby foreclosing any possibility that [] Nsouli might reclaim the property." *Id.* ¶ 38.
>
> (iii) Count IV (Violation of the Virginia Commercial Code): Public Storage violated the Virginia Commercial Code ("VCC"), Va. Code § 8.7-403(1) by "failing to fulfill its obligation as warehouseman and bailee to deliver bailed goods to a person entitled to them, namely [] Nsouli." *Id.* ¶ 42. Public Storage also violated the VCC, Va. Code. § 8.7-204(1) by: (a) "negligently authorizing the removal and destruction of [] Nsouli's property"; (b) "negligently failing to supervise and safeguard the property in its possession, custody and control"; and (c) "negligently concealing and failing to timely notify [sic] [] Nsouli of the unauthorized destruction of the property." *Id.* ¶ 43.

**Insurance Policy**

Zurich issued Shurgard an insurance policy, Policy No. GLO 8297986-05, covering bodily injury and property damage for the time period during which Nsouli's medical records were destroyed. The insurance policy is in two parts: (i) the Commercial General Liability

Coverage Form ("CGL form"), and (ii) the Customer Goods Legal Liability, Sale and Disposal Legal Liability Endorsement ("Customer Goods Endorsement").

The CGL form provides three separate grants of coverage. The only grant of coverage relevant to the instant dispute is Coverage A, which deals with "Bodily Injury and Property Damage Liability." The insuring agreement for Coverage A states that Zurich will provide coverage for damages that the insured is legally obligated to pay because of "bodily injury" or "property damage" caused by an "occurrence." Coverage A has its own set of exclusions, including Exclusion (a), which provides that Coverage A "does not apply to . . . 'bodily injury' or 'property damage' expected or intended from the standpoint of the insured." Additionally, Exclusion (j)(4) states that the CGL form "does not apply to . . . 'property damage' to . . . [p]ersonal property in the care, custody or control of the insured."

The Customer Goods Endorsement contains two grants of coverage. Section I covers property damage to a customer's property. That section provides:

> We will pay those sums that the insured becomes legally obligated to pay as "damages" because of "property damage" to which this insurance applies caused by an "occurrence" to "customer's" property . . . only while at the insured premises.

Section I has its own list of exclusions, only one of which is pertinent here. Exclusion (3) provides that Section I coverage does not apply to liability:

> Arising out of the removal, sale, disposal or destruction of your "customer's" property by you or other party of interest, your or their employees or agents or any person or persons to whom you may entrust such property.

Section II of the Customer Goods Endorsement provides coverage for damages arising from sale and disposal operations (*i.e.*, actions taken to recover storage units from customers who are delinquent on rental payments). This section states:

> We will pay those sums that the insured becomes legally obligated
> to pay as "damages" for your acts or omissions arising from
> "lockout" or the sale, removal or disposition of the "customer's"
> property as a result of "sale and disposal operations." This
> insurance applies only to acts or omissions which occur during the
> policy period.

Section II has its own list of exclusions, but there is no contention that any of the exclusions

pertinent to this coverage is applicable here.

**Proceedings to Date**

Following the destruction of his records, Nsouli notified Public Storage, by letter dated

August 2, 2007, of his potential claims and sought an early settlement. Public Storage notified

Zurich of Nsouli's claims. By letter dated September 7, 2007, Zurich advised Public Storage that

the CGL form and Customer Goods Endorsement might well not cover Nsouli's claims, but that

it would investigate the matter under a full reservation of rights. After Nsouli initiated the

Virginia state-court action, Zurich sent Public Storage another "reservation of rights" letter dated

June 17, 2009, stating that it would defend Public Storage against Nsouli's claims. Yet, Zurich

noted in this letter that certain claims might not be covered under the policy, and it reserved the

right to withdraw its defense and deny coverage.

Zurich filed this action on December 22, 2009, seeking a declaration that it does not have

a duty to defend or indemnify Public Storage against the claims asserted by Nsouli in the state-

court action. In its Declaratory Judgment Complaint, Zurich alleges that Coverage A of the CGL

form does not cover the allegations in the Underlying Complaint because: (i) destruction of the

medical records was not an "occurrence"; (ii) diminution in value of Nsouli's medical practice

does not constitute "property damage"; (iii) Exclusion (j)(4) applies because the Underlying

Complaint alleges that the medical records were destroyed while in the care, custody, or control

of Public Storage; and (iv) Exclusion (a) relieves Zurich of the duty to defend because the

documents were destroyed through a conscious decision of Public Storage. Zurich further argues that Section I of the Customer Goods Endorsement does not impose a duty to defend because the factual allegations in the Underlying Complaint trigger Exclusion (3), which excludes claims for damages arising from the destruction of a customer's property by the insured's employees or agents. Finally, Zurich asserts that there is no duty to defend pursuant to Section II of the Customer Goods Endorsement because that section only provides coverage for damages arising from "sale and disposal operations," and there are no allegations in the Underlying Complaint suggesting that Nsouli's records were destroyed pursuant to such operations.

Public Storage initially sought unsuccessfully to stay this action pending resolution of the state-court lawsuit. *See Zurich Am. Ins. Co. v. Public Storage, et al.*, 1:09cv1394 (E.D. Va. Mar. 17, 2010) (Mem. Op.). Thereafter, the parties submitted cross-motions for summary judgment. The issues have now been fully briefed and argued, and the matter is therefore ripe for disposition.

## II.

The summary judgment standard is too well-settled to require elaboration here. In essence, summary judgment is appropriate under Rule 56, Fed. R. Civ. P., only where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Importantly, to defeat summary judgment, the non-moving party may not rest upon a "mere scintilla" of evidence, but must set forth specific facts showing a genuine issue for trial. *Id.* at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Thus, the party with the burden of proof on an issue cannot prevail at summary judgment on that issue unless he or she adduces evidence that would be sufficient, if believed, to carry the burden of proof on that issue at trial. *See Celotex*, 477 U.S. at 322. When

considering cross-motions for summary judgment, each motion should be evaluated separately using the standard set forth above. *See ITCO Corp. v. Michelin Tire Corp., Commercial Div.,* 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to *resolve* genuine issues of material fact on a motion for summary judgment-even where . . . both parties have filed cross motions for summary judgment.").

In this case, the material facts are essentially uncontested and the dispute turns entirely on whether these uncontested facts fit within the scope of the coverage provided by the CGL form or the Customer Goods Endorsement. Given the absence of any dispute of material fact, adjudication by way of summary judgment is appropriate.

## III.

The threshold issue is the choice of governing law. Because this is a diversity action, it is axiomatic that questions of state law are governed by the forum state's law, including the forum's choice-of-law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941). In an insurance contract dispute, Virginia's choice-of-law rules dictate that "generally, the law of the place where [the] contract is written and delivered controls issues as to its coverage." *Buchanan v. Doe,* 431 S.E.2d 289, 291 (Va. 1993). Here, there is no dispute that the insurance policy was delivered in Washington and hence Washington law governs interpretation of the policy.

A different result obtains with respect to the law governing the claims in the Underlying Complaint. Under Virginia choice-of-law rules, the substantive law governing tort claims is "the law of the place of the wrong." *McMillan v. McMillan,* 253 S.E.2d 662, 663 (Va. 1979). Here, because the alleged wrongful conduct occurred in Virginia, it is Virginia law that governs the Virginia common law and statutory claims in the underlying state action.

# IV.

At issue is Zurich's duty to defend Public Storage against the claims asserted by Nsouli in the Underlying Complaint. Washington's law governing an insurer's duty to defend is well-settled and begins with the principle that "the duty to defend is broader than the duty to indemnify." *Campbell v. Ticor Title Ins. Co.*, 209 P.3d 859, 861 (Wash. 2009).[6] It is also clear that "[t]he duty to defend arises at the time an action is first brought, and is based on the *potential* for liability." *Truck Ins. Exch. v. Vanport Homes, Inc.*, 58 P.3d 276, 281 (Wash. 2002) (emphasis added). In this respect, an insurer has a duty to defend if "the complaint against the insured, construed liberally, alleges facts which could, if proven, impose liability upon the insured within the policy's coverage." *Woo v. Fireman's Fund Ins. Co.*, 164 P.3d 454, 459 (Wash. 2007) (internal quotation marks and citations omitted). Put differently, an insurer has a duty to defend whenever the "insurance policy *conceivably* covers the allegations in the complaint." *Id.* (emphasis added). And, where a complaint is ambiguous, "it will be liberally construed in favor of triggering the insurer's duty to defend." *Truck Ins. Exch.*, 58 P.3d at 282.

Unlike most jurisdictions, in Washington, where some claims are covered by an insurance policy and others are not, the insurer has a duty to defend only the covered claims.[7]

---

[6] The corollary to this principle is that the duty to indemnity may not arise even where there is a duty to defend and the defense is ultimately unsuccessful. This may occur, for example, in a negligence or statutory claim where the underlying complaint includes several sets of allegations, one of which is sufficient to trigger a duty to defend, but the insured's liability for the claims turns out in the end to be based on facts that are either outside of, or excluded from, coverage. In other words, where a claim may be proved or established by more than one set of allegations, an insurer may have a duty to defend based on one set of allegations, and yet may not have a duty to indemnify if liability is established by a set of allegations falling outside the scope of coverage. Of course, where an essential element of the claim falls within a valid policy exclusion, there can be no duty to defend or to indemnify with respect to that claim.

[7] *Compare Waite*, 467 P.2d at 851 (holding that insurer "had an obligation and a right, under the provisions of its policy of indemnity insurance, to conduct the defense against those claims which came within the policy coverage, but it had neither the duty nor the right to defend

Of course, in cases where there is a duty to defend some, but not all claims, conflicts of interest and other practical problems may arise. The Supreme Court of Washington noted this problem, stating as follows:

> We have held that, where the complaint alleges more than one cause of action, one or more of which is within the policy coverage and one or more without, the insurer is obligated to defend only those causes which fall within the policy coverage. In such a case a conflict of interest between the insured and the insurer may be involved, and where this occurs, the insurer may properly turn the defense of the case over to the insured, reimbursing him for the defense of that portion of the suit which relates to the covered cause of action.

*Seaboard Surety Co.*, 504 P.2d at 1140 n.1.

To determine whether allegations in a complaint fall within the scope of coverage of an insurance policy requires construing the policy. In this regard, Washington courts "construe insurance policies as contracts." *Australia Unlimited, Inc. v. Hartford Cas. Ins. Co.*, 198 P.3d 514, 517 (Wash. 2008). And "[t]he policy is interpreted as a whole with each term given a 'fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.'" *Pac. Ins. Co. v. Catholic Bishop of Spokane*, 450 F. Supp. 2d 1186, 1197 (E.D. Wash. 2006) (quoting *Sears v. Grange Ins. Ass'n*, 762 P.2d 1141, 1142 (Wash. 1988)). Where a policy defines particular terms, those terms "should be interpreted in accordance with their definitions." *Id.* But where terms are left undefined, the terms "must receive their 'plain, ordinary, and popular' meaning." *Id.* (quoting *Kitsap County v. Allstate Ins.*

---

against the claims which were undisputedly outside the coverage"), *and Prudential Prop. & Cas. Ins. Co.*, 724 P.2d 418, 423 (Wash. Ct. App. 1986) ("When a complaint alleges several causes of action, some of which are covered and some of which are not, the insurer is obligated to defend only those actions that fall within the scope of coverage."), *with* Couch on Insurance § 200:25 (3d ed. West 2010) (explaining that "[i]n the majority of jurisdictions, an insurer's duty to defend extends to the entire action, which includes covered, potentially covered, and uncovered allegations within the claim").

*Co.*, 964 P.2d 1173, 1178 (Wash. 1998)). Washington courts determine the ordinary meaning of undefined terms by looking to "standard English dictionaries." *Kitsap County*, 964 P.2d at 1178. Importantly, "inclusionary clauses are interpreted liberally to provide coverage whenever possible and exclusionary clauses are construed strictly against the insurer." *Catholic Bishop of Spokane*, 450 F. Supp. 2d at 1201 (citing *Port of Seattle v. Lexington Ins. Co.*, 48 P.3d 334, 338 (Wash. Ct. App. 1994)).

The remaining principles of policy construction applicable in Washington are the same as those well-settled everywhere. Where the language in an insurance policy is clear, "the court must enforce it as written and may not modify the contract or create an ambiguity where none exists." *Transcontinental Ins. Co. v. Washington Pub. Utils. Dists. Util. Sys.*, 660 P.2d 337, 340 (Wash. 1988). An insurance policy is ambiguous if "the language used is fairly susceptible to two different reasonable interpretations." *Kitsap County*, 964 P.2d at 1178. Where a policy term is ambiguous, "extrinsic evidence, if any, of the parties' intent may normally be considered." *Id.* But if "a policy remains ambiguous even after resort to extrinsic evidence, then the ambiguity is construed against the insurer." *Id.*

With these principles in mind, the question presented is whether the Underlying Complaint, construed liberally, alleges facts which could, if proven, impose liability on Public Storage that is covered by either the CGL form or the Customer Goods Endorsement. The first step in the analysis is to construe the insurance policy to determine the scope of the coverage. The second step in the analysis is to examine the allegations in the Underlying Complaint to determine whether the insurance policy, properly construed under Washington law, conceivably covers any claims as governed by Virginia law.

## A.

The CGL form provides insurance coverage for all damages that Public Storage is legally obligated to pay because of "property damage" caused by an "occurrence." These key terms are defined in the policy. "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Property damage," in turn, is defined as:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

The CGL form also includes two relevant exclusions. Under Exclusion (a), the policy "does not apply to . . . 'bodily injury' or 'property damage' expected or intended from the standpoint of the insured." Pursuant to Exclusion (j)(4), there is no coverage for "property damage" to "[p]ersonal property in the care, custody or control of the insured." Thus, under the CGL form, Zurich owes Public Storage a duty to defend against claims alleging property damage resulting from an accident. Yet, pursuant to the pertinent exclusions, Zurich has no duty to defend Public Storage if the property damage was intentional, or if the property was damaged while in Public Storage's care, custody, or control.

The parties dispute whether the claims in the Underlying Complaint fall within the coverage provided by the CGL form. Specifically, the parties dispute whether the removal and destruction of Nsouli's medical records from his storage unit, as alleged in the Underlying Complaint, was an "occurrence" or "accident" that resulted in "property damage" within the

meaning of the policy. Next, the parties dispute whether the claims in the Underlying Complaint trigger any of the policy's exclusions. Each of these disputes is separately addressed.

## 1. Occurrence (or Accident)

The CGL form defines "occurrence" to include an "accident," but it does not provide a specific definition for the word "accident." When left undefined, Washington courts typically define "accident" as "an unusual, unexpected, and unforeseen happening." *Grange Ins. Co. v. Brosseau*, 776 P.2d 123, 125 (Wash. 1989). Based on this definition, Washington courts have concluded that whether property damage is caused by an "accident" turns on whether the property damage was reasonably foreseeable. *See State Farm Fire & Cas. Co. v. Ham & Rye, LLC*, 174 P.3d 1175, 1181 (Wash. Ct. App. 2007) (holding that the court could not determine at summary judgment stage whether damage to a building was an "accident" because it was not clear from the facts whether it was reasonably foreseeable that a fire started by teenagers on a sidewalk would spread to an adjacent building). *Nationwide Mut. Ins. Co. v. Hayles, Inc.*, 150 P.3d 589, 594 (Wash. Ct. App. 2007) (holding that the destruction of an onion field constituted an "accident" within the scope of the insurance policy because there was no evidence in the record that the insured's employee "knew or should have known" that turning on the irrigation system would damage the onion crop). Thus, in the instant case, whether the Underlying Complaint alleges an "accident" turns on whether the Underlying Complaint alleges facts that would warrant the finder of fact to conclude that the destruction of Nsouli's records was unforeseeable.

Here, the police report attached to the Underlying Complaint alleges that Public Storage's acting manager never instructed Sam's Contracting to clear out Nsouli's storage unit. *See* Underlying Comp. Ex. B. The Underlying Complaint also alleges that "Defendants removed and

destroyed all of the medical and financial records in Unit 270 without authorization." *Id.* ¶ 17. Because the Underlying Complaint does not specify which of the two defendants named in the Underlying Complaint removed and destroyed the records, it is possible that the allegation of removal and destruction refers solely to Sam's Contracting. Taken together, these allegations plausibly suggest that Public Storage never ordered the removal and destruction of Nsouli's records, and that Sam's Contracting destroyed the records on its own initiative. Of course, even if Public Storage did not specifically authorize Sam's Contracting to destroy the records, the Underlying Complaint alleges that Public Storage's employees and representatives observed Sam's Contracting as it removed Nsouli's medical records from his storage unit. *Id.* ¶ 18. Yet, simply observing the removal of the boxes does not necessarily mean that Public Storage knew that Sam's Contracting was disposing of the boxes at the dump, or otherwise destroying the records. Indeed, consistent with a plaintiff's prerogative to allege claims in the alternative, the allegation that Public Storage's employees observed Sam's Contracting remove Nsouli's medical records from his storage unit is broad enough to include the possibility that Public Storage's employees believed that Sam's Contracting was only removing the records temporarily while it repaired the ceiling.[8] Because the Underlying Complaint leaves open the possibility that Public Storage did not realize that Sam's Contracting was removing Nsouli's records for the purpose of

---

[8] The Underlying Complaint alleges that "[n]umerous Public Storage representatives and agents witnessed and directly authorized the removal and destruction of the property." Underlying Comp. ¶ 18. The same paragraph of the Underlying Complaint alleges alternatively that Public Storage's representatives and agents "failed to inquire, intercede or otherwise take reasonable steps to safely secure the property." *Id.* The second allegation, in contrast to the first, is broad enough to include the possibility that Public Storage's representatives passively observed as Sam's Contracting removed boxes from the storage unit, and that Public Storage's representatives were unaware that Sam's Contracting was disposing of the records. Similarly, the Underlying Complaint seeks to hold Public Storage liable for "negligently authorizing the removal and destruction of [] Nsouli's property," or alternatively for "failing to supervise and safeguard the property in its possession, custody and control." *Id.* ¶ 43.

disposing of them, it is fair to conclude that the Underlying Complaint also leaves open the possibility that the destruction of the records was not reasonably foreseeable to Public Storage. Thus, it is fair to conclude that the Underlying Complaint, broadly construed, contains allegations that Nsouli's records were destroyed by an "accident."

Nevertheless, the allegation that Public Storage violated the VCC by "negligently authorizing the removal and destruction of [] Nsouli's property" is not conceivably covered by the policy. *Id.* ¶ 43. If Public Storage authorized Sam's Contracting to remove and destroy Nsouli's records, then the destruction of those records would have been reasonably foreseeable to Public Storage and hence the property damage would not have been caused by an "accident."[9]

## 2. Property Damage

The CGL form defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property." Washington courts have interpreted similar definitions of "property damage" to provide coverage for "consequential damages arising from intangible injury . . . when they result directly from injury to or destruction of tangible property." *Yakima Cement Prods. Co. v. Great Am. Ins. Co.*, 608 P.2d 254, 259 (Wash. 1980) (holding that although consequential damages resulting from injury to tangible property fall within the definition of "property damage," the damages arising from construction delays were not covered because no injury to tangible property occurred when defective concrete panels were incorporated into the operations building); *see also Gen. Ins. Co. of Am. v. Gauger*, 528 P.2d 563, 566 (Wash. Ct. App. 1975) (holding that insurance policy covered damages for "crop loss" because the damages resulted from physical injury to the wheat field (*i.e.*, tangible property)).

---

[9] The claim that Public Storage violated the VCC by "negligently concealing and failing to timely notify [sic] [] Nsouli of the unauthorized destruction of the property" is also not covered by the CGL form because the failure to notify Nsouli in a timely manner of the destruction of the records *after* the records were destroyed cannot be the cause of the property damage.

Here, the Underlying Complaint alleges "physical injury to tangible property" because the complaint alleges that Nsouli's medical records, *i.e.*, tangible property, were destroyed. *See* Underlying Comp. ¶ 17. To be sure, the Underlying Complaint also seeks damages owing to injuries to Nsouli's medical practice and research resulting from the loss of the records. The damages flowing from these intangible injuries are also covered by the CGL form because they result directly from the destruction of Nsouli's personal property. *See Yakima Cement Prods. Co.*, 608 P.2d at 259; *Gauger*, 528 P.2d at 566. On the other hand, the CGL form does not cover any claim for treble damages under the VCPA because those damages are statutory and cannot be said to "result directly" from the destruction of the records or from Nsouli's inability to use the records.[10]

Zurich argues that the diminution in value of Nsouli's medical practice does not constitute "property damage" within the meaning of the CGL form. Zurich supports its argument by citing cases where courts have held that economic losses do not qualify as "physical injury to tangible property."[11] These cases are inapposite because Public Storage is not contending that the diminution in value of Nsouli's medical practice constitutes "physical injury to tangible property." Rather, Public Storage argues that the destruction of Nsouli's medical records was "physical injury to tangible property," and the diminution in value of his medical practice is part of the consequential damages flowing directly from that injury. And as discussed above, settled Washington law holds that consequential damages flowing directly from

---

[10] The claim for punitive damages is also not covered by the Customer Goods Endorsement because the endorsement's definition of "damages" does not include "any fine, sanction, penalty, or punitive or exemplary damages."

[11] *ABM Indus., Inc. v. Zurich Am. Ins. Co.*, 05-cv-3480, 2006 WL 2595944, at *13 (N.D. Cal. Sept. 11, 2006); *America Online, Inc. v. St. Paul Mercury Ins. Co.*, 207 F. Supp. 2d 459, 469-70 (E.D. Va. 2002); *Washington Pub. Util. Dists. Utils. Sys. v. Pub. Util. Dist. No. 1 of Clallam County*, 771 P.2d 701, 709 (Wash. 1989).

intangible injuries are covered by the CGL form if the intangible injuries result directly from physical injury to tangible property. *See Yakima Cement Prods. Co.*, 608 P.2d at 259; *Gauger*, 528 P.2d at 566. In sum, therefore, the Underlying Complaint includes allegations which, broadly construed, fall within the definition of "property damage" in the CGL form.

## 3. Exclusions

Because the Underlying Complaint, liberally construed, includes allegations that Nsouli's medical records were destroyed as a result of an "accident" and because at least some of the alleged damages constitute "property damage," it is necessary to consider whether any exclusion prohibits CGL coverage. In Washington, "[b]ecause coverage exclusions are contrary to the fundamental protective purpose of insurance, they are strictly construed against the insurer and will not be extended beyond their clear and unequivocal meaning." *Diamaco, Inc. v. Aetna Cas. & Surety Co.*, 983 P.2d 707, 711 (Wash. Ct. App. 1999). The two exclusions pertinent here are: (i) Exclusion (a) ("Expected or Intended Injury exclusion"); and (ii) Exclusion (j)(4) ("Care, Custody, or Control exclusion").

### a. Expected or Intended Injury Exclusion

Exclusion (a) states that "[t]his insurance does not apply to . . . 'property damage' expected or intended from the standpoint of the insured." The Washington Supreme Court has interpreted this exclusion to mean that the insured must subjectively expect or intend the property damage. *See Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 882 P.2d 703, 714 (Wash. 1994); *Rodriquez v. Williams*, 729 P.2d 627, 630 (Wash. 1986). As discussed above in the section on "occurrence," the Underlying Complaint, liberally construed, alleges that Public Storage did not expect (or intend) that Sam's Contracting would destroy Nsouli's records.

Accordingly, the Expected or Intended Injury exclusion does not relieve Zurich of its duty to defend Public Storage in the state-court action.[12]

Zurich argues that *all* of the VCPA claims are barred by the Expected or Intended Injury exclusion because willful conduct is necessary to establish a violation of the VCPA, and willful conduct falls squarely within the exclusion. This argument is unpersuasive; it erroneously assumes that only willful conduct violates the VCPA. To be sure, the VCPA provides treble damages if a person willfully violates the VCPA. *See* Va. Code Ann. § 59.1-204 (West 2010). But non-willful VCPA violations still entitle a plaintiff to recover actual damages and attorneys' fees. *See Nelson v. Cowles Ford, Inc.*, 01-cv-1526, 2003 WL 22293597, at *4 (4th Cir. Oct. 7, 2003).

Here, the claim that Public Storage violated the VCPA by "willfully conceal[ing] the unlawful destruction of the property, thereby foreclosing any possibility that [] Nsouli might reclaim the property" is not potentially covered by the CGL form. In order to establish liability for this claim, Nsouli must prove that Public Storage intended to cause him injury, which brings the claim within the scope of the exclusion.[13] On the other hand, the claim that Public Storage "misrepresented the provision and implementation of security measures to secure the premises and to prevent the loss of property" is potentially covered by the policy. This is so because the

_____

[12] Nevertheless, the exclusion does bar the claim that Public Storage "negligently authoriz[ed] the removal and destruction of [] Nsouli's property." Underlying Comp. ¶ 43. If Public Storage authorized the destruction of the records, it certainly subjectively expected or intended the property damage.

[13] The claim that Public Storage violated the VCPA by "misrepresent[ing] that Public Storage would conduct an internal investigation and report the findings regarding the wrongful disbursement of the property" is also not potentially covered by the CGL form. The alleged conduct (*i.e.*, failure to conduct an internal investigation) cannot be the cause of the property damage (*i.e.*, destruction of the records). Indeed, during oral argument, counsel for Public Storage correctly conceded that Zurich does not have a duty to defend this claim under the insurance policy provisions at issue here. *See* Tr. of 8/13/10 Hr'g at 11-12.

Underlying Complaint, broadly construed, includes the allegation that Nsouli relied on the various representations concerning security measures in renting the space and in providing Public Storage with the key. And the falsity of these representations proximately caused the destruction of his records. Moreover, under Virginia law, Public Storage may be liable for this claim even if the misrepresentation about its security measures was non-willful. *See Nelson,* 2003 WL 22293597, at *4. Thus, coverage for this VCPA claim is not barred by the Expected or Intended Injury exclusion.

### b. Care, Custody, or Control Exclusion

The CGL form states that "[t]his insurance does not apply to . . . 'property damage' to . . . [p]ersonal property in the care, custody or control of the insured." Under Washington law, the Care, Custody, or Control exclusion is unambiguous and the words "must be given their plain and ordinary meaning." *Madden v. Vitamilk Diary, Inc.,* 367 P.2d 127, 128 (Wash. 1961). Washington courts have not precisely defined the phrase "care, custody, or control," but they have provided some guidance for determining whether the exclusion applies in a given case. Thus, there is no doubt that an insured has care, custody, or control of property when the insured has physical control over the property. *See Transamerica Ins. Co. v. Preston,* 632 P.2d 900, 904 (Wash. Ct. App. 1981) (holding that care, custody, or control exclusion barred coverage because insured was operating the train when collision occurred); *see also* Couch on Insurance § 126:22 (3d ed. West 2010) ("Physical control is the hallmark of 'care, custody, and control' of another's property."). It is further clear that the exclusion applies in situations where an insured does not have physical control over the property, but is directly supervising the person exercising physical control. *See Madden,* 367 P.2d at 129 (holding that dairy company had care, custody, and control over delivery truck because dairy employees directly supervised all movements of the

truck during the unloading process). Finally, Washington courts have determined that an insured has care, custody, and control over stored goods if the insured has access to the goods and assumes some responsibility for safeguarding the property. *See Cashmere Pioneer Growers, Inc. v. Unigard Security Ins. Co.*, 891 P.2d 732, 734-35 (Wash. Ct. App. 1995) (holding that storage company had care, custody, and control over apples stored in temperature-controlled rooms); *New Hampshire Ins. Co. v. Abellera*, 495 P.2d 668, 670 (Wash. Ct. App. 1972) (holding that insureds had care, custody, and control over neighbor's car stored in their garage for safekeeping).

Here, the Care, Custody, or Control exclusion operates to relieve Zurich of the duty to defend the bailment claims[14] because, in order to prove the elements of a bailment claim, Nsouli must prove facts that trigger the exclusion. Under Virginia law, to succeed on a bailment claim, the plaintiff must establish that the alleged bailee had "lawful possession" of the property. *K-B Corp. v. Gallagher*, 237 S.E.2d 183, 185 (Va. 1977) (quoting *Crandall v. Woodward*, 143 S.E.2d 923, 927 (1965)). To have lawful possession, an alleged bailee "must have both physical control with the intent to exercise that control." *Morris v. Hamilton*, 302 S.E.2d 51, 52-53 (Va. 1983). Of course, if Nsouli succeeds in establishing that Public Storage was a "bailee" of his records because Public Storage had control of the records, this would trigger the Care, Custody, or Control exclusion. *See, e.g., Park 'N Go of Georgia, Inc. v. United State Fid. & Guar.*, 471 S.E.2d 500, 503 (Ga. 1996) ("When the insured is a bailee of property, that property has generally been found to be in the 'care, custody or control' of the insured within the meaning of the insurance coverage exclusion."). Accordingly, Zurich does not have a duty to defend the claim that Public Storage breached its common law duties as a bailee, or the claim that Public

---

[14] Nsouli asserts two bailment claims: (i) a common law breach-of-bailment claim; and (ii) a statutory claim for violating a bailee's duty to deliver under Va. Code § 8.7-403(1).

Storage breached Va. Code § 8.7-403(1) by failing to deliver bailed goods to a person entitled to receive them.

The same analysis applies to the claim that Public Storage violated its duty of care as a warehouseman under Va. Code § 8.7-204(1).[15] The VCC defines a "warehouseman" as "a person engaged in the business of storing goods for hire." *Id.* § 8.7-102(1)(m). Although the statutory definition of "warehouseman" may not mention possession of goods, a person who stores goods for hire falls squarely within Virginia's definition of "bailee." *See Morris*, 302 S.E.2d at 52-53 (holding that a bailee "must have both physical control with the intent to exercise that control"). Moreover, Virginia law is clear that a warehouseman is a type of bailee.[16] Thus, in order to establish that Public Storage is liable for breaching its duty as a "warehouseman," Nsouli must prove that Public Storage had control of the medical records, which triggers the Care, Custody, or Control exclusion. Accordingly, Zurich has no duty to defend the claim that Public Storage violated Va. Code § 8.7-204(1).

---

[15] This provision provides as follows:

> A warehouseman is liable for damages for loss of or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful man would exercise under like circumstances but unless otherwise agreed he is not liable for damages that could not have been avoided by the exercise of such care.

Va. Code § 8.7-204(1) (2010).

[16] *See Revenue Aero Club v. Alexandria Airport*, 64 S.E.2d 671, 674 (Va. 1951) ("The plaintiff's case was predicated upon the company's liability as a warehouseman or bailee for hire."); *Jon Nix & Co. v. Herbert*, 140 S.E. 121, 122-23 (Va. 1927 ) (referring to the owner of goods stored in a warehouse as a bailor); *see also* 19 Michie's Jurisprudence § 4, at 682 (1991) ("A warehouseman is a bailee for compensation or hire, bound to exercise ordinary care for the safety of the property entrusted to him, not a mere gratuitous one, liable only for loss or injury by willful misconduct or gross negligence.").

Public Storage argues that the bailment and VCC claims do not automatically trigger the Care, Custody, or Control exclusion because Public Storage may be liable for those claims even if the medical records were destroyed while in the physical control of Sam's Contracting. It is true that, under certain circumstances, a bailee may be liable for the destruction of bailed property that is no longer within its physical control.[17] Yet, a bailee is held liable in those circumstances precisely because the bailee was entrusted with the goods by the bailor, and the bailee cannot divest himself of the responsibility for safeguarding the goods by giving them away. *See United States Fire Ins. Co. v. Paramount Fur Svc.*, 145 N.E.2d 844, 848 (Ohio Ct. App. 1957) ("The relationship of bailor and bailee is one in which the bailor trusts the possession of his property to the bailee for the accomplishment of the bailment purpose."). In other words, while the goods are no longer within the bailee's physical control, they are still within the bailee's care. Thus, Public Storage may be held liable as a bailee only if Nsouli's medical records were within its physical control, or if the records were in a third party's physical control, but Public Storage still had responsibility to care for the goods. Under either of these scenarios, the medical records would fall within Public Storage's care, custody, or control, thereby triggering the exclusion. It follows that Zurich is relieved of its duty to defend the bailment and VCC claims.

---

[17] *See Comet v. United States*, 66 F. Supp. 231, 233 (E.D. Pa. 1946) ("[T]he rule is well-settled that a bailee for hire is responsible for the proper care, not only by himself, but by any one to whom he entrusts it and it makes no difference whether that other is an independent contractor or not."); *Tomas v. Nationwide Mut. Ins. Co.*, 607 N.E.2d 944, 947 (Ohio Ct. App. 1992) (holding that bailee cannot avoid its duty to the bailor by creating a new bailment); *West Am. Ins. Co. v. Stith*, 585 N.E.2d 903, 905 (Ohio Ct. App. 1990) ("[A] bailee who attempts to delegate its responsibility under a contract of bailment to an independent contractor without the consent of the bailor is liable on the contract even though the bailee used due care in selecting the independent contractor.").

Based on the foregoing, under the CGL form, Zurich has a duty to defend Public Storage in the state-court action against the claim that Public Storage violated the VCPA by "misrepresent[ing] the provision and implementation of security measures to secure the premises and to prevent the loss of property." Underlying Comp. ¶ 38. And this duty to defend includes defending against the allegation of damages to Nsouli's medical practice and research.

Zurich has no duty to defend against claims that Public Storage: (i) breached its common law duty as a bailee; (ii) violated the VCPA by: (a) "misrepresent[ing] that Public Storage would conduct an internal investigation and report the findings regarding the wrongful disbursement of the property"; and (b) "willfully conceal[ing] the unlawful destruction of the property, thereby foreclosing any possibility that [] Nsouli might reclaim the property"; (iii) violated § 8.7-403(1) of the VCC by failing to deliver bailed goods to a person entitled to receive them; and (iv) violated § 8.7-204(1) of the VCC by: (a) "negligently authorizing the removal and destruction of [] Nsouli's property"; (b) "negligently failing to supervise and safeguard the property in its possession, custody and control"; and (c) "negligently concealing and failing to timely notify [sic] [] Nsouli of the unauthorized destruction of the property." It also does not have a duty to defend against claims for treble damages.

## B.

Since some of Nsouli's claims are clearly not covered by the CGL form, it is necessary to determine whether these claims are potentially covered by the Customer Goods Endorsement. The Customer Goods Endorsement contains two separate grants of coverage. Section I covers property damage to a customer's property, while Section II deals with damages resulting from sale and disposal operations. Each section has its own set of exclusions. For the reasons that

follow, neither section of the Customer Goods Endorsement covers the allegations in the

Underlying Complaint.

**1. Section I – Customer's Goods Legal Liability**

The parties do not seriously dispute whether Section I covers the claims in the

Underlying Complaint. In its pleadings, Zurich argues that Section I does not cover the claims

because Exclusion (3) bars coverage. In response, Public Storage does not address the issue,

focusing the majority of its attention on whether a duty to defend arises under Section II of the

endorsement.

Section I of the Customer Goods Endorsement is titled "Customer Goods Legal

Liability." Similar to Coverage A of the CGL form, Section I of the Customer Goods

Endorsement provides:

> We will pay those sums that the insured becomes legally obligated
> to pay as "damages" because of "property damage" to which this
> insurance applies caused by an "occurrence" to the "customer's"
> property.

"Customer" is defined as "a tenant, lessee or any person or organization leasing, renting or

otherwise occupying self storage space(s) at the insured premises." Section I has its own list of

exclusions. Exclusion (3) provides:

> This insurance does not apply to liability . . . [a]rising out of the
> removal, sale, disposal or destruction of your "customer's"
> property by you or other party of interest, your or their employees
> or agents or any person or persons to whom you may entrust such
> property.

Here, the Underlying Complaint alleges that either Public Storage or Sam's Contracting

removed and destroyed Nsouli's medical records from his storage unit. *See* Underlying Comp.

¶ 17. In either case, Exclusion (3) bars coverage because either the insured, Public Storage, or

someone entrusted with the customer's property destroyed the customer's goods. Thus, Zurich does not have a duty to defend any claims pursuant to this provision.

## 2. Section II – Sale and Disposal Legal Liability

Unlike Section I, the parties vigorously dispute whether Section II of the Customer Goods Endorsement provides coverage for Nsouli's claims. Section II of the endorsement is titled "Sale and Disposal Legal Liability" and provides as follows:

> We will pay those sums that the insured becomes legally obligated to pay as "damages" for your acts or omissions arising from "lockout" or the sale, removal or disposition of the "customer's" property as a result of "sale and disposal operations."

"Lockout" is defined as "depriving the customer access to this property or to occupancy of his space." "Sale and disposal operations" are defined as:

> [A]ctivities and procedures which you conduct in your self service storage business to reclaim rented space in self storage units at the insured premises for which rental or other charges are delinquent and unpaid.

The parties dispute the proper construction of Section II, which has an important effect on the scope of coverage. Zurich argues that the limiting clause "as a result of 'sale and disposal operations'" applies to claims arising from a "lockout" as well as to claims resulting from the "sale, removal or disposition of the 'customer's' property." Based on that construction, Zurich contends that Section II only provides coverage for damages that arise during "sale and disposal operations," regardless of whether the damages were caused by a "lockout" or the "sale, removal or disposition of the 'customer's' property." According to Zurich, once Section II is properly construed, it is apparent that it cannot cover Nsouli's claims because Nsouli's records were destroyed during the process of repairing the ceiling in Nsouli's storage unit, not during "sale and disposal operations."

Public Storage has a different interpretation of Section II. According to Public Storage, the limiting clause "as a result of 'sale and disposal operations'" applies only to claims arising from the "sale, removal or disposition of the 'customer's' property"; it does not apply to claims resulting from a "lockout." Based on this interpretation, Public Storage contends that Section II covers claims arising from a "lockout" regardless of whether the "lockout" occurred during "sale and disposal operations." According to Public Storage, once Section II is interpreted correctly, it is apparent that the endorsement covers Nsouli's claims. Specifically, Public Storage argues that the Underlying Complaint alleges damages arising from a "lockout" because a "lockout" is defined as "depriving the customer access to this property" and destroying Nsouli's records was one way of depriving him of access to those records.

Zurich's argument is more persuasive. The only reasonable interpretation of Section II is that the clause "as a result of 'sale and disposal operations'" modifies both "lockout" and "sale, removal and disposition of the 'customer's' property." First, the title of Section II is "Sale and Disposal Legal Liability." Based on that title, an ordinary person reading the insurance policy would infer that the section provides coverage for claims dealing with "sale and disposal operations." *Australia Unlimited, Inc.*, 198 P.3d at 517 ("The court considers the policy as a whole, and gives it a 'fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.'") (internal quotations marks and citations omitted). Yet, under Public Storage's interpretation of Section II, the coverage for a "lockout" is completely divorced from the coverage from "sale and disposal operations." While the title of the section does not conclusively determine the scope of coverage within that section, it is persuasive evidence in favor of Zurich's interpretation.

Second, Public Storage's interpretation of "lockout" is unreasonable because it renders other provisions in the endorsement superfluous. Washington courts are clear that "[i]n construing the language of an insurance policy, the entire contract must be construed together so as to give force and effect to each clause." *Transcontinental Ins. Co.*, 760 P.2d at 340. Here, Public Storage interprets Section II to provide coverage for a "lockout" regardless of whether the "lockout" occurs during "sale and disposal operations." Moreover, Public Storage interprets a "lockout" to include situations where Public Storage's employees or agents dispose of a customer's property. If Public Storage is correct, all of the conduct that is excluded in Exclusion (3) of Section I—which excludes coverage for claims that Public Storage or its agents destroyed a customer's property—would be covered under Section II. It is unreasonable to suggest that the parties excluded coverage for certain types of acts in Section I and then granted coverage for those same acts in Section II.

To be sure, under Zurich's interpretation, Section I excludes coverage for claims that Public Storage or its employees and agents destroyed a customer's property, while Section II grants coverage for similar conduct. The key difference is that, under Zurich's interpretation, Section II only provides coverage for damages caused by Public Storage's employees or agents in a specific situation, namely sale and disposal operations. Zurich's interpretation carves out a small exception to Exclusion (3). It does not render the entire exclusion superfluous because, outside of sale and disposal operations, the destruction of a customer's property by Public Storage's employees or agents is not covered. Under Public Storage's interpretation, in contrast, all of the excluded conduct would be covered under its broad interpretation of "lockout."

Finally, Public Storage's argument that the rules of grammar and contract interpretation lead inexorably to the conclusion that the clause "as a result of 'sale and disposal operations'"

- 28 -

only modifies "sale, removal or disposition of the 'customer's property'" is not persuasive. According to Public Storage, the use of the word "or" to separate "lockout" from "sale, removal or disposition of the 'customer's' property as a result of 'sale and disposal operations,'" means that coverage for a "lockout" is separate and distinct from coverage for "sale, removal or disposition." In addition, Public Storage argues that the last antecedent rule requires that the limiting clause "sale or disposal operations" should be applied only to the noun or phrase that immediately precedes it, not to the term "lockout."

Here, there is no dispute that the word "or" is being used in the disjunctive. Both parties agree that Section II provides coverage for claims arising from a "lockout" *or* for claims arising from "the sale, removal or disposition of the 'customer's' property." The disputed question is whether the modifying clause "as a result of 'sale and disposal operations'" applies only to the phrase immediately preceding it, and not also to a "lockout." It is well-settled that "Washington courts do not apply the last antecedent rule inflexibly or take it as always binding." *Black v. Nat'l Merit Ins. Co.*, 226 P.3d 175, 183 (Wash. Ct. App. 2010). Indeed, there are cases where Washington courts have determined that a statutory or contractual provision is more appropriately interpreted by applying a limiting clause to several preceding phrases, rather than the last antecedent. *See, e.g., State v. McGary*, 93 P.3d 941, 946 (Wash. Ct. App. 2004). It is not reasonable to apply the last antecedent rule here because applying the rule would divorce "lockout" from the purpose of the section, which is to provide "Sale and Disposal Legal Liability," and it would also render one of the exclusions in the endorsement superfluous.

Because Section II is properly construed to grant coverage only for claims alleging damages arising from "sale and disposal operations," it follows that Section II does not cover the claims in the Underlying Complaint. It is undisputed that Nsouli was not delinquent in his rent

and was not in breach of any rental agreement at the time his property was removed and destroyed. Thus, the destruction of Nsouli's records could not have occurred during the course of "sale and disposal operations," and Section II of the Customer Goods Endorsement therefore provides no coverage for the destruction of the records.

## V.

In conclusion, Zurich has a duty to defend Public Storage against one, but not all, of the claims in the Underlying Complaint. Specifically, Zurich has a duty to defend the following claim:

> (i) Count III (Violation of the Virginia Consumer Protection Act): Public Storage breached the VCPA, Va. Code § 59.1.200 by "misrepresent[ing] the provision and implementation of security measures to secure the premises and to prevent the loss of property."

On the other hand, Zurich has no duty to defend the remaining claims in the Underlying Complaint:

> (i) Count I (Breach of Bailment): Public Storage violated its common law duties as a bailee by failing "to exercise the required duty of care to prevent the damage or loss of the bailed property."
>
> (ii) Count III (Violation of the Virginia Consumer Protection Act): Public Storage violated the VCPA, Va. Code § 59.1.200 by: (a) "misrepresent[ing] that Public Storage would conduct an internal investigation and report the findings regarding the wrongful disbursement of the property"; and (b) "willfully conceal[ing] the unlawful destruction of the property."
>
> (iii) Count IV (Violation of the Virginia Commercial Code): Public Storage violated the VCC, Va. Code § 8.7-403(1) by "failing to fulfill its obligation as warehouseman and bailee to deliver bailed goods to a person entitled to them." Public Storage also violated the VCC, Va. Code § 8.7-204(1) by: (a) "negligently authorizing the removal and destruction of [] Nsouli's property"; (b) "negligently failing to supervise and safeguard the property in its possession, custody and control"; and (c) "negligently

concealing and failing to timely notify [sic] [] Nsouli of the unauthorized destruction of the property."

Accordingly, summary judgment for both parties on the issue of Zurich's duty to defend must be granted in part and denied in part. Summary judgment on Zurich's duty to indemnify is, of course, premature and not reached here, as resolution of that issue depends on the Virginia court's decision on the nature of Public Storage's liability, if any, to Nsouli.[18]

An appropriate Order will issue.[19]

Alexandria, Virginia
September 16, 2010

T. S. Ellis, III
United States District Judge

---

[18] Also neither reached nor decided is the manner in which the result reached here should be implemented in the underlying Virginia court case. As noted, Washington, contrary to the majority of jurisdictions, obligates an insurer to defend only those claims that potentially fall within the policy's coverage; the insured is required to defend the remaining, uncovered claims. *See, e.g., Waite*, 467 P.2d at 851. This established rule introduces a complexity that does not arise in other jurisdictions where an insurer is required to defend not only potentially covered claims, but uncovered claims as well. The complexity, as the Supreme Court of Washington noted, is that a conflict of interest may arise between an insured and insurer. According to the Supreme Court, the insurer "may properly turn the defense of the case over to the insured, reimbursing him for the defense of that portion of the suit which relates to the covered cause of action." *Seaboard Surety Co.*, 504 P.2d at 1140 n.1. Given this, it is also worth noting that the parties should take appropriate steps to ensure that the judge or jury in the underlying case specify, by findings or special interrogatories, the factual nature of Public Storage's liability, if any, to Nsouli so that issues of indemnification can be resolved in a subsequent action should there be a dispute over indemnification.

[19] The parties' competing contentions regarding litigation expenses will be addressed in a separate order.

-31-